## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**DERRICK WILSON**                                                                              **PLAINTIFF**

**v.**                                      **Case No. 4:21-CV-01102-LPR**

**GROVE US, LLC and**
**MANITOWOC RE-MANUFACTURING, LLC**                                    **DEFENDANTS**

## ORDER

Derrick Wilson filed this lawsuit against Grove US, LLC and Manitowoc Re-Manufacturing, LLC (collectively, "Grove").[1]  Mr. Wilson alleges race discrimination under Title VII of the Civil Rights Act and under 42 U.S.C. § 1981.[2]  Mr. Wilson's race discrimination allegations fall into three buckets: (1) Grove provided Mr. Wilson with inferior painting equipment compared to similarly situated white coworkers; (2) Grove failed to provide Mr. Wilson the same compensation that it provided to similarly situated white coworkers; and (3) Grove subjected Mr. Wilson to a hostile work environment.[3]

Currently before the Court is Grove's Motion for Summary Judgment.[4]  For the reasons discussed in this Order, Grove's Motion is GRANTED in part and DENIED in part.  As a threshold

---

[1] Defendants argue that Manitowoc Re-Manufacturing, LLC is not a proper party in this case because it "was dissolved in November 2020," "no longer exists," and "never employed Wilson."  Br. in Supp. of Defs.' Mot. for Summ J. (Doc. 21) at 2; *see also* Ex. D (Inactive Companies List) to Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1) at 10.  Mr. Wilson argues that "defendant is making much ado about whether the plaintiff worked for Manitowoc or Grove US, LLC. In that the plaintiff has sued both identities, it really does not matter one way or the other."  Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 27) at 8 n.3.  Mr. Wilson also provides his July 9, 2020 offer letter and his January 11, 2020 voluntary resignation letter.  Both letters list "Manitowoc" as his employer.  Ex. C (Offer Letter) to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 27-2); Ex. F (Voluntary Resignation) to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 27-4).  At this stage of the litigation, the Court will side with Mr. Wilson and keep both Grove US, LLC and Manitowoc Re-Manufacturing, LLC as defendants.

[2] Compl. (Doc. 1). Mr. Wilson also brought a failure-to-accommodate claim under the Americans with Disabilities Act, but he has since conceded that this claim cannot survive summary judgment.  May 8, 2023 Hr'g Tr. (Rough) at 49–50.

[3] Compl. (Doc. 1) ¶¶ 52–55.

[4] Defs.' Mot. for Summ. J. (Doc. 20).

matter, two of the three Title VII claims don't even get out of the gate.  That is because Mr. Wilson did not exhaust administrative remedies with respect to those two claims.[5]  While Mr. Wilson did file an EEOC Charge, that EEOC Charge only mentioned Mr. Wilson being denied "a pay increase."[6]  The EEOC Charge did not mention an inferior painting equipment claim or a hostile work environment claim.[7]  So Mr. Wilson can't bring those two claims in court under Title VII.[8]

The remaining claims—the Title VII claim for inferior compensation and the § 1981 claims for inferior painting equipment, inferior compensation, and a hostile work environment—merit more consideration.  Ultimately, however, only the § 1981 hostile work environment claim proceeds to trial.  Summary judgment in favor of Grove is appropriate on all other claims.

## BACKGROUND[9]

Grove "manufactures cranes and boom trucks for the construction, energy, and infrastructure industries."[10]  Grove "has a remanufacturing plant in Bauxite, Arkansas that mainly focuses on refurbishing equipment."[11]  Part of that refurbishment includes painting the equipment.  Mr. Wilson worked as a painter at the Bauxite facility from March of 2020 until his resignation in

---

[5] *See* 42 U.S.C. § 2000e-5(e)(1), (f)(1); *Kirklin v. Joshen Paper & Packaging of Ark. Co.*, 911 F.3d 530, 534 (8th Cir. 2018).

[6] Ex. A (EEOC Charge) to Compl. (Doc. 1); *see* Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts (Doc. 26) ¶ 48.

[7] Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts (Doc. 26) ¶ 48.

[8] *Cottrill v. MFA, Inc.*, 443 F.3d 629, 634 (8th Cir. 2006) (stating that a plaintiff may only "seek relief for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in [his] administrative charge").

[9] For this Background Section, the Court relies largely on undisputed facts.  Where there is a genuinely disputed fact, the Court adopts the version of the fact that is most favorable to Mr. Wilson, unless no rational juror would adopt that version of the fact.  And the Court gives Mr. Wilson all reasonable inferences from all the facts it adopts.  Essentially, the Court considers the most pro-plaintiff version of the record that a rational juror could conclude occurred.  *See Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 760 (8th Cir. 1998).

[10] Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1) ¶ 4.

[11] *Id.*

January of 2022.[12]  During his tenure at Grove, Mr. Wilson was either the only Black employee or one of very few Black employees at the Bauxite facility.[13]  For example, as of December 31, 2021, Mr. Wilson was one of two Black employees at the Bauxite facility—out of approximately 60 employees.[14]

Let's start at the beginning.  In March of 2020, Mr. Wilson received (through a staffing agency) an interview with the Plant Production Manager of Grove's Bauxite facility, Paul Green.[15] After the interview, Mr. Green—in conjunction with Director of Human Resources Ashley Barkdoll—hired Mr. Wilson to work as a painter on a temporary basis.[16]  Mr. Wilson worked as a temporary employee until July 9, 2020.[17]  Then, after a second interview, Ms. Barkdoll made the decision to hire him full-time as a painter, partly because "everyone said [he] was doing a really good job" as a temporary employee.[18]

Mr. Wilson was "responsible for preparing components to enable quality paint finishes, and painting both large and small crane parts . . . ."[19]  While painters sometimes paint components as small as six inches, most of the job involves "prepping and painting the 'boom' section of

---

[12] Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts (Doc. 26) ¶¶ 5, 33.

[13] Dep. of Derrick Wilson (Doc. 34) at 276:5–18.

[14] Ex. A (Defs.' Suppl. Discovery Resps.) to Ex. 2 (Decl. of Katelynn Williams) to Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30-2) ¶ 3.

[15] Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts (Doc. 26) ¶ 5; Dep. of Derrick Wilson (Doc. 34) at 61:3–23.

[16] Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1) ¶ 10.

[17] *Id.* ¶ 12.

[18] Dep. of Derrick Wilson (Doc. 34) at 62:18–25.  Ms. Barkdoll testified that both she and Mr. Green made the decision to hire Mr. Wilson full-time. Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1) ¶ 12. But according to Mr. Wilson, it was only Ms. Barkdoll who made the decision.  Dep. of Derrick Wilson (Doc. 34) at 63:18–64:13, 252:3–22. Because this motion for summary judgment is brought against Mr. Wilson, the Court resolves this dispute in Mr. Wilson's favor.

[19] Ex. 2 (Decl. of Paul Green) to Defs.' Mot. for Summ. J. (Doc. 20-2) ¶ 5.

cranes, which are 40 feet long, eight feet wide, and eight feet tall."[20]   Painters are also expected to be able to "operate orbital sanders, spray equipment, and forklifts."[21]   Overall, the job is physically demanding, requiring "frequent standing, reaching, climbing, balancing, stopping, kneeling, crawling, and lifting/moving up to 50 pounds."[22]

Mr. Wilson worked in an area of the plant that was some distance away from most other employees.[23]   And he worked alongside just one other painter: Eric Walker.[24]   Mr. Walker, who is white, was also initially hired through a staffing agency.[25]   By the time Mr. Wilson was hired, Mr. Walker had worked at the plant during three different stints and had developed advanced skills as a painter.[26]   During Mr. Wilson's tenure, Mr. Walker was "the lead man for the paint department" and was Mr. Wilson's supervisor.[27]   Mr. Walker and Mr. Wilson worked well together; Mr. Walker testified that Mr. Wilson was "a good worker" and that together they "put out more products [in 2020] than [the Bauxite facility] ever has."[28]

In November of 2020—eight months after Mr. Wilson was hired as a temporary employee through the staffing agency and four months after Mr. Wilson was hired full-time directly by Grove—Mr. Wilson suffered a workplace injury.[29]   While "[p]ulling parts off a rack doing [his]

---

[20] *Id.*

[21] *Id.*

[22] *Id.* ¶ 6.  Mr. Wilson notes that often the lifting involved much more than 50 pounds.  Dep. of Derrick Wilson (Doc. 34) at 70:12–21.

[23] Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts (Doc. 26) ¶ 15; Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1) ¶ 13; Dep. of Eric Walker (Doc. 35) at 32:18–20.

[24] Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1) ¶ 13.

[25] *Id.*; Dep. of Eric Walker (Doc. 35) at 45:22–46:2.

[26] Ex. 2 (Decl. of Paul Green) to Defs.' Mot. for Summ. J. (Doc. 20-2) ¶ 8.

[27] Dep. of Derrick Wilson (Doc. 34) at 63:6–12.

[28] Dep. of Eric Walker (Doc. 35) at 56:9–12.

[29] Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1) ¶ 16.

normal job dut[ies]," Mr. Wilson injured his left shoulder, lower back, and left knee; and he also reported chest pain.[30]  Mr. Wilson's medical providers issued numerous physical restrictions that severely limited his ability to perform the essential functions of the painter role.[31]  From that point until his resignation, Grove placed Mr. Wilson in an alternative light-duty role at a desk.[32]

Mr. Wilson claims he was subjected to various forms of race discrimination during his nearly two-year employment with Grove.  Specifically, Mr. Wilson claims that, during his time as a painter, he was given inferior respiratory-protective equipment as compared to the respiratory-protective equipment given to similarly situated white coworkers; he also claims that, over the course of his employment, he was given inferior compensation as compared to the compensation given to similarly situated white coworkers; and he claims he was subjected to hostility from Grove management.  The Court discusses the background facts relevant to each claim in turn.

## I.    Respiratory-Protective Equipment

While painting, painters at Grove are required to wear air-supplied hoods for respiratory protection.[33]  The two primary types of hoods that Grove painters wear are Powered Air-Purifying Respirators (PAPRs) and Tyvek hoods.[34]  PAPRs are "much more expensive than Tyvek hoods," costing between $1,500 and $2,000 each.[35]  That's because PAPRs "do not rely on an air hose connected to an air supply some distance away" and so wearing a PAPR "might make it easier for Painters to maneuver . . . ."[36]  Additionally, PAPRs have a "hard helmet on the top to protect

---

[30] Dep. of Derrick Wilson (Doc. 34) at 109:2–110:10; Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts (Doc. 26) ¶ 25.

[31] Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts (Doc. 26) ¶ 26.

[32] Ex. 2 (Decl. of Paul Green) to Defs.' Mot. for Summ. J. (Doc. 20-2) ¶ 10.

[33] Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts (Doc. 26) ¶ 17.

[34] *See* Ex. 2 (Decl. of Paul Green) to Defs.' Mot. for Summ. J. (Doc. 20-2) ¶¶ 14–16.

[35] *Id.* ¶ 15.

[36] *Id*.

[one's] head."[37]  The Tyvek hoods, on the other hand, are made out of paper and have a supplied airline hooked onto the hood that's fed oxygen from compressors in the main shop.[38]  Although PAPRs offer potential performance benefits, Mr. Green (the Plant Production Manager of the Bauxite facility) maintains that PAPRs and Tyvek hoods are equally safe.[39]  In fact, all 54 painters at a Grove facility in Pennsylvania use Tyvek hoods.[40]

Before Mr. Wilson was hired, Mr. Green secured one PAPR for the Bauxite Painter Department.[41]  This "trial" PAPR was given to Mr. Walker because Mr. Walker had made receiving a PAPR a condition of his returning to Grove for a third stint of employment.[42]  Apparently, during Mr. Walker's second stint of employment, Mr. Walker had bad acid reflux issues that he attributed to Grove not changing the filters on the air supply to his Tyvek hood.[43]  Despite making the purchase of a PAPR a condition of his return, it was "several months" before Mr. Walker got his PAPR.[44]

When Mr. Wilson was hired, Mr. Green "promised" Mr. Wilson that he would order Mr. Wilson a PAPR.[45]  But Mr. Wilson never received a PAPR during the entirety of his time at Grove. Instead, he used a Tyvek hood with "holes all in it," which Mr. Wilson believes contributed to his chest pain.[46]  Mr. Green did not even attempt to order a PAPR for Mr. Wilson until October of

---

[37] Dep. of Derrick Wilson (Doc. 34) at 203:14–15.

[38] Dep. of Eric Walker (Doc. 35) at 42:4–9.

[39] Ex. 2 (Decl. of Paul Green) to Defs.' Mot. for Summ. J. (Doc. 20-2) ¶ 15.

[40] *Id.* ¶ 14; Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts (Doc. 26) ¶ 20.

[41] Ex. 2 (Decl. of Paul Green) to Defs.' Mot. for Summ. J. (Doc. 20-2) ¶ 16.

[42] *Id.*; Dep. of Eric Walker (Doc. 35) at 41:10–18.

[43] Dep. of Eric Walker (Doc. 35) at 42:9–22.

[44] *Id.* at 41:16–18.

[45] Dep. of Derrick Wilson (Doc. 34) at 67:14–15.

[46] *Id.* at 113:9–14.

2020—which was seven months after Mr. Wilson came on board through the staffing agency and three months after Mr. Wilson was hired full-time directly by Grove.[47]  When Mr. Green eventually put the order in (October of 2020), the order was delayed until after February of 2021 due to Covid-related supply disruptions.[48]  At that point, Mr. Wilson was no longer performing painter duties because of his November 2020 workplace injury.[49]

Mr. Wilson testified that two white painters (other than Mr. Walker) received and used PAPRs during part of Mr. Wilson's tenure at the Bauxite facility.[50]  But this occurred well after Mr. Wilson stopped painting due to his injury.  The two white painters—Taylor Wyatt and Rodney Shannon—were hired in mid-2021.[51]  According to Mr. Green, Mr. Green did not encounter supply-chain disruptions in mid-2021 when he ordered PAPRs for Mr. Wyatt and Mr. Shannon.[52]

## II.   Compensation at Grove

According to Mr. Wilson, Mr. Green was the sole decisionmaker over raises.[53]  But this is really just speculation on Mr. Wilson's part.  The record reveals that, while Mr. Green certainly may have had a say in compensation decisions, there is a fairly comprehensive wage structure at Grove.  Grove pays its employees according to a step-rate pay structure.[54]  To determine the base rates for each position, Grove sets a "grade" for each position depending on the "degree of

---

[47] Ex. 2 (Decl. of Paul Green) to Defs.' Mot. for Summ. J. (Doc. 20-2) ¶ 16.

[48] *Id.* ¶¶ 16–17.

[49] *Id.* ¶ 17.

[50] Dep. of Derrick Wilson (Doc. 34) at 205:16–206:10.

[51] Ex. 2 (Decl. of Paul Green) to Defs.' Mot. for Summ. J. (Doc. 20-2) ¶¶ 20, 22.

[52] *Id.* ¶ 23.

[53] Dep. of Derrick Wilson (Doc. 34) at 101:4–10.  Mr. Wilson bases his belief on the fact that Mr. Green was the "[o]nly supervisor down there," that Mr. Green told Mr. Wilson to come to Mr. Green with any problems Mr. Wilson had, and that other employees were able to get raises from Mr. Green by threatening to quit. *Id.* at 90:5–94:22, 101:11–14.

[54] *See, e.g.*, Ex. B (January 2020 Step-Rate Pay Structure) to Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1).

knowledge, skill, training, responsibility, and effort required."[55]  Within each grade, there are eight different "steps" depending on the employee's skills and training.[56]  Each increase in step corresponds to an increase in hourly rate.[57]  While increases in pay are discretionary and never automatic, the Bauxite facility typically offers a cost-of-living adjustment in the spring, a performance-based pay increase in the fall, and updates its overall pay structure periodically.[58]

The record also reveals that Ms. Barkdoll (the Director of Human Resources) was involved in compensation-related decisions.  Generally, "Human Resources [was] responsible for approving all compensation-related decisions."[59]  More specifically as to Mr. Wilson, Ms. Barkdoll makes clear that she was an equal partner with Mr. Green in deciding to hire Mr. Wilson as a temporary employee, in setting Mr. Wilson's initial pay rate, and in deciding to hire Mr. Wilson as a full-time employee.[60]  Mr. Wilson provides no competent record evidence to dispute Ms. Barkdoll's role in these decisions—either generally or specifically as related to Mr. Wilson.

### A.      Mr. Wilson's Pay

When Mr. Wilson was first hired in a temporary role in March of 2020, he was brought on at Grade 312, Step 4.[61]  This translated to an hourly rate of $18.00 on the step-rate pay structure.[62]

---

[55] Ex. A (Excerpt to Employee Handbook) to Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1).

[56] *See, e.g.*, Ex. B (January 2020 Step-Rate Pay Structure) to Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1).

[57] *See, e.g.*, *id.*

[58] Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1) ¶¶ 6, 8, 17.

[59] *Id.* ¶ 7.

[60] *Id.* ¶¶ 10–12.

[61] Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1) ¶ 11.  Although Mr. Wilson was classified as a Painter II on the January 2020 pay structure, both sides agree that he was really performing the Painter I role. Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts (Doc. 26) ¶ 5; Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 27) at 8; Dep. of Derrick Wilson (Doc. 34) at 97:17–19; May 8, 2023 Hr'g Tr. (Rough) at 9.

[62] Ex. B (January 2020 Step-Rate Pay Structure) to Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1).

Neither Mr. Wilson nor any other worker received a cost-of-living adjustment in the spring of 2020 because of financial concerns related to the Covid pandemic.[63]  But Mr. Wilson did receive a (very small) increase in pay a few months later when he was hired full-time in July of 2020.[64]  Grove had previously (in May of 2020) updated its step-rate pay structure, which repositioned the painter job on the pay scale.[65]  As a temporary employee, Mr. Wilson did not get the benefit of the May 2020 pay-structure update when it occurred.  He only indirectly benefited from it when he was hired full-time by Grove in July of 2020.

In any event, the pay increase resulting from Mr. Wilson's formal hiring by Grove in July of 2020 was only $0.09 per hour—to $18.09 (Grade 313, Step 2).[66]  At minimum, Mr. Wilson believes that, based on his past painting experience and his performance as a temporary employee, he should have received a bump to Grade 313, Step 4 at $19.23 per hour.[67]  But perhaps more importantly, Mr. Wilson was unhappy because Mr. Green told Mr. Wilson he would get a raise to $22.00 per hour after his 90 days as a temporary worker if he did a good job.[68]

While other employees received an additional raise in the fall (around October) of 2020, Mr. Wilson was not eligible for this fall performance-based raise.[69]  To be eligible for the fall performance-based raise, an employee had to have been employed in a full-time position for at least 90 days between January and the end of June.[70]  Thus, only employees who were employed

---

[63] Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1) ¶ 8.

[64] *Id.* ¶ 14.

[65] *Id.*

[66] *Id.*

[67] Dep. of Derrick Wilson (Doc. 34) at 100:9–18.

[68] *Id.* at 65:3–5, 100:19–101:3.

[69] Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1) ¶ 15.

[70] *Id.* ¶ 9.

on a full-time basis before April 1, 2020, were eligible for the fall 2020 performance-based raise.[71] And Mr. Wilson was not hired full-time until July of 2020.[72]  So Mr. Wilson stayed at his $18.09 hourly rate until corporate reevaluated the company's wage scales in May of 2021.[73]  That reevaluation brought him to $18.50.[74]  Finally, in August of 2021, Mr. Wilson received a raise to $19.08 per hour when wage scales were "modified for all production employees."[75]

### B.      The Pay of Other Painters

To support his racial-discrimination-in-pay claim, Mr. Wilson points to two other painters who worked at the Bauxite facility around the same time that Mr. Wilson worked there.  Anthony Dick and Taylor Wyatt, who are white, were also paid according to the facility's structure.[76] Here's what you need to know about them and their pay.

Mr. Dick was hired by Grove in a full-time painter role in February of 2020—a month before Mr. Wilson was hired in the temporary role through the staffing agency.[77]  While Mr. Dick was classified as a painter, at some point he was moved into a "blasting" role.[78]  As a blaster, Mr. Dick was responsible for sandblasting paint off various crane sections rather than actually painting them.[79]  Like Mr. Wilson, Mr. Dick started out making $18.00 per hour at Grade 312, Step 4.[80]

---

[71] *Id.* ¶ 15.

[72] *Id.* ¶ 12.

[73] *Id.* ¶ 17.

[74] *Id.*

[75] Ex. A (Defs.' Suppl. Discovery Resps.) to Ex. 2 (Decl. of Katelynn Williams) to Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30-2) ¶ 8; Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1) ¶ 18.

[76] Ex. A (Defs.' Suppl. Discovery Resps.) to Ex. 2 (Decl. of Katelynn Williams) to Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30-2) ¶¶ 7, 10.

[77] Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1) ¶ 19.

[78] Dep. of Eric Walker (Doc. 35) at 35:13–17.

[79] *Id.* at 18:9–10.

[80] Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1) ¶ 19.

On May 17, 2020, when Grove updated its step-rate pay structure, Mr. Dick—who had then been a full-time Grove employee for three months—received a pay increase to $18.66 (Grade 313, Step 3).[81]  Recall that Mr. Wilson was a temporary employee at the time, and thus his pay did not increase during the May 2020 pay-structure update.  Also recall that, when Mr. Wilson was hired full-time in July of 2020, he was placed at Grade 313, Step 2 on the May 2020 pay structure. That was one step below Mr. Dick's classification on the May 2020 pay structure.  The one-step difference translated into a $0.57 per hour difference in pay.

Then, in October of 2020, Mr. Dick got his performance raise; he was bumped up to $19.23 per hour at Grade 313, Step 4.[82]  Having been a full-time employee since February of 2020, he (unlike Mr. Wilson) was eligible for this performance raise.[83]  In any event, as of October of 2020, Mr. Dick was being paid two steps above Mr. Wilson, which translated into a $1.14 per hour difference in pay.  Fast forward to May of 2021.  Both Mr. Dick and Mr. Wilson got adjustments when corporate reevaluated the company's wage scales: Mr. Dick to $19.66 and Mr. Wilson to $18.50.[84]  Their respective grades and steps on the pay structure did not change.  Three months later—in August of 2021—wage scales were "modified for all production employees."[85]  Both Mr. Dick and Mr. Wilson went up one step from where they were in the pay structure: Mr. Dick to Grade 313, Step 5, and Mr. Wilson to Grade 313, Step 3.  Mr. Dick's pay was $20.24, while Mr. Wilson's pay was $19.08: a difference of $1.16.[86]

---

[81] Ex. A (Defs.' Suppl. Discovery Resps.) to Ex. 2 (Decl. of Katelynn Williams) to Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30-2) ¶ 7.

[82] *Id.*

[83] *See supra* notes 69–72 and accompanying text.

[84] Ex. A (Defs.' Suppl. Discovery Resps.) to Ex. 2 (Decl. of Katelynn Williams) to Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30-2) ¶¶ 7–8.

[85] *Id.* ¶ 7.

[86] *Id.* ¶¶ 7–8.

11

Thirteen days later, also in August of 2021, Mr. Dick was promoted to Painter II.[87]  This promotion was initiated by Mr. Green and approved by Human Resources.[88]  The promotion came with a raise to $22.33 per hour. That's because Painter II is on a higher grade—Grade 321 compared to Grade 313.  Mr. Wilson was never promoted to Painter II, which is not particularly surprising given that his November 2020 injury prevented him from fulfilling even the Painter I role.[89]  So, from late August of 2021 to Mr. Wilson's resignation in January of 2022, there was a $3.25 per hour wage gap between Mr. Dick and Mr. Wilson.

Mr. Wyatt, also white, was hired in a full-time role by Grove in June of 2021 as a Painter I at Grade 313, Step 2 making $18.50 per hour.[90]  This was the same step at which Mr. Wilson had been hired as a full-time employee in July of 2020.[91] Mr. Wyatt then benefited from the same adjustment in August of 2021 that Mr. Wilson did, both receiving a raise to $19.08 per hour.[92] However, like Mr. Dick (indeed, on the very same day as Mr. Dick), Mr. Wyatt was soon promoted to Painter II.[93]  As was true of Mr. Dick's promotion, Mr. Wyatt's promotion was initiated by Mr. Green and approved by Human Resources.[94]  And, like Mr. Dick's promotion, Mr. Wyatt's promotion came with a raise to $22.33 per hour—because of the grade jump.  This promotion, which occurred less than three months after Mr. Wyatt had been hired as a full-time employee, left

---

[87] *Id.* ¶ 7.

[88] *Id.*

[89] Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts (Doc. 26) ¶ 26.

[90] Ex. 1 (Decl. of Ashley Barkdoll) to Defs.' Mot. for Summ. J. (Doc. 20-1) ¶ 23.

[91] While Mr. Wyatt was hired in June of 2021 at the same step that Mr. Wilson was hired full-time at in July of 2020, Mr. Wyatt's starting hourly rate was $0.41 higher than Mr. Wilson's full-time starting rate was.  That's because when corporate reevaluated the company's wage scales in May of 2021, the pay for a Grade 313, Step 2 went from $18.09 to $18.50. Ex. A (Defs.' Suppl. Discovery Resps.) to Ex. 2 (Decl. of Katelynn Williams) to Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30-2) ¶ 8.

[92] *Id.* ¶¶ 8, 10.

[93] *Id.* ¶¶ 7, 10.

[94] *Id.*

the same $3.25 per hour pay gap between Mr. Wyatt and Mr. Wilson that existed between Mr. Dick and Mr. Wilson.  Again, this gap persisted from the end of August of 2021 to Mr. Wilson's resignation in January of 2022.

## III.   Work Environment

Taking the most pro-plaintiff read of the record, it appears that Mr. Green was a less than ideal manager—and that's an understatement.  Mr. Wilson and Mr. Walker testified that, during their time at the Bauxite facility, they and other employees were subjected to both verbal and physical aggression from Mr. Green.  Beyond this, Mr. Green also visited other indignities upon Mr. Wilson.

### A.   Verbal Aggression

Mr. Wilson testified that, "[a]lmost on a daily [basis]," Mr. Green would get within an arm's reach of Mr. Wilson and yell "at the top of his voice."[95]  Mr. Walker testified that Mr. Green yelled at Mr. Walker "maybe twice a month" and had cussed him out before.[96]  Mr. Walker also testified that three white painters (Mr. Dick, Mr. Wyatt, and Mr. Shannon) and two minority workers (Fred Burnett and Rudy Godinez) had been yelled at by Mr. Green.[97]

Mr. Green wasn't the only manager doing the yelling.  Mr. Walker and Mr. Wilson both testified that Mark Mangum, another manager at the Bauxite facility, yelled at them as well.[98]  According to Mr. Walker, at one point Mr. Mangum yelled at him so bad that the company called 911 and Mr. Walker had to go to the emergency room.[99]

---

[95] Dep. of Derrick Wilson (Doc. 34) at 76:22–77:6.

[96] Dep. of Eric Walker (Doc. 35) at 22:1, 25:16–23.

[97] Id. at 20:20, 21:7, 35:1–7, 62:12–22; Dep. of Derrick Wilson (Doc. 34) at 233:9–12, 237:2–3.

[98] Dep. of Derrick Wilson (Doc. 34) at 147:7–11, 149:25–150:3; Dep. of Eric Walker (Doc. 35) at 54:15–55:3.

[99] Dep. of Eric Walker (Doc. 35) at 54:15–55:3.

13

Beyond just the yelling, Mr. Wilson also described several offensive comments that were made to Mr. Wilson by Mr. Green and Mr. Mangum. One day at the office, Mr. Wilson's phone rang and a picture of his white girlfriend popped up on the screen. Mr. Green picked up the phone and threw it down, saying that he did not "believe in mixed relationships."[100] Another incident occurred when Mr. Green was giving a new hire a tour of the facility. Mr. Green introduced the new hire to both Mr. Wilson and Mr. Walker and asked the new hire if he could "tell them apart."[101] There's more. Mr. Green would tease Mr. Wilson when Mr. Wilson was working at a desk after his workplace injury by closing the doors around him and saying it "look[s] like you're in jail."[102] And, referring to Black Lives Matter protesters who pulled a truck driver out of his truck and beat him, Mr. Green told Mr. Wilson that Mr. Green "would plow all of them over."[103] Finally, Mr. Wilson testified that Mr. Mangum called Mr. Wilson "Yankee" and "boy."[104]

Mr. Wilson isn't the only one who heard Mr. Green make racially charged statements at work. Mr. Walker testified that Mr. Green sometimes referred to a Black truck driver as a "Black MF'er" when Mr. Green was upset with how the driver had loaded the truck.[105] Mr. Walker also testified that Mr. Green casually used the "N-word" in conversation with Mr. Walker.[106] The impression Mr. Walker was left with was that Mr. Green is a "racist" and that he "doesn't get along with anybody that's of another color . . . ."[107]

---

[100] Dep. of Derrick Wilson (Doc. 34) at 151:5–11.

[101] *Id.* at 152:11–14.

[102] *Id.* at 223:10–12.

[103] *Id.* at 151:21–25.

[104] *Id.* at 150:11–24. Mr. Wilson testified that "Paul['s] friend Bill" also called him a Yankee, but he couldn't provide Bill's last name or any other identifying information. *Id.* at 74:4–6, 150:11–24.

[105] Dep. of Eric Walker (Doc. 35) at 91:24–92:2.

[106] *Id.* at 92:3–11.

[107] *Id.* at 64:14–15, 65:17–19.

### B.      Physical Aggression

Mr. Wilson described four different physical interactions he had with Mr. Green.  While Mr. Wilson does not remember the date that it occurred, the first interaction he described involved Mr. Green striking Mr. Wilson across the ankle with an umbrella.  Mr. Wilson was "sanding a . . . crane boom section" and was "partially in the way of the walkway . . . ."[108]  Apparently, Mr. Green was already upset about something else when he encountered Mr. Wilson in the walkway.[109]  Mr. Green then "slapped [Mr. Wilson] across [Mr. Wilson's] ankle with [an umbrella] and told [Mr. Wilson] to get out the way."[110]

The second physical interaction Mr. Wilson described occurred while Mr. Wilson was performing his normal job duties; again, he does not remember the date that it occurred.[111]  Mr. Green "came by and shoved [Mr. Wilson] really hard and told [Mr. Wilson] to cheer up."[112]  Mr. Wilson had never seen Mr. Green shove anyone else like that before.[113]

The third physical interaction Mr. Wilson described occurred on August 25, 2020.[114]  It seems Mr. Green mistakenly thought that Mr. Wilson had left "the top up on the paint waste drum."[115]  In a fit of anger, Mr. Green grabbed Mr. Wilson aggressively and spun him around, causing Mr. Wilson's arm to get cut on a nearby door.[116]

---

[108] Dep. of Derrick Wilson (Doc. 34) at 84:14–16.

[109] *Id.* at 84:21–24.

[110] *Id.* at 84:16–18.

[111] *Id.* at 88:13–16.

[112] *Id.* at 88:13–14.

[113] *Id.* at 89:11–14.

[114] *Id.* at 159:4–5.

[115] *Id.* at 159:6–21.

[116] *Id.* at 159:5–23.

The fourth and final physical interaction Mr. Wilson alleges he had with Mr. Green happened on October 27, 2020.[117]  Mr. Wilson was "cleaning the paint brushes out" when Mr. Green ran up to him and "just start[ed] punching" Mr. Wilson in the back and "[s]hadow [b]oxing" him.[118]  Mr. Wilson testified that Mr. Green was "[b]ringing [f]orce" but not punching him as hard as someone would in an actual boxing match.[119]  Still, the punches were hard enough to be painful to Mr. Wilson.[120]  Mr. Wilson had never seen Mr. Green do that to anyone else.[121]

Mr. Green wasn't only physical with Mr. Wilson.  Mr. Walker recounted some instances where Mr. Green's physical aggression was directed at Mr. Walker and other employees.  Shortly after Mr. Green hit Mr. Wilson with an umbrella, Mr. Green also "tapped [Mr. Walker] on the leg with the umbrella."[122]  In another incident, Mr. Green grabbed Mr. Walker's left arm and dragged him across the room, which Mr. Walker characterized as "horseplay" that he "didn't like."[123]  Finally, one time Mr. Walker had to break up a choking match between Mr. Green and another (white) employee.[124]

### C.      Other Workplace Indignities

In addition to the verbal and physical aggressions, Mr. Wilson described certain workplace restrictions that seemingly only applied to him.  Towards the beginning of Mr. Wilson's employment, when he was the only Black employee, Mr. Green told Mr. Wilson that Mr. Wilson

---

[117] *Id.* at 211:5.

[118] *Id.* at 209:7–16, 210:14.

[119] *Id.* at 210:5–25.

[120] *Id.* at 210:11–12.

[121] *Id.* at 213:11.

[122] Dep. of Eric Walker (Doc. 35) at 74:1–12.

[123] *Id.* at 12:19–14:11.

[124] *Id.* at 31:14–32:9.

was not allowed to take a certain shortcut from the parking lot to the work area.[125]  Instead of being allowed to use a door that cut straight through the office, Mr. Wilson had to use a different door that required Mr. Wilson to take a long route all the way around the back.  Yet "everybody" else that Mr. Wilson knew "always" just walked through the office door.[126]  In short, Mr. Green told Mr. Wilson he was "not allowed to walk through the office door" and Mr. Wilson knew "everyone else c[ould] . . . ."[127]

The separate-door issue was not the only indignity. Mr. Wilson testified that Mr. Green gave Mr. Wilson stricter rules about eating and drinking in the workplace than he gave other employees.  According to Mr. Wilson, he was told that he was not allowed to eat or drink by "the paint booth," even though he was not aware of that rule applying to any other employees.[128] Similarly, Mr. Wilson testified that Mr. Green singled Mr. Wilson out in front of a group of people, yelling at Mr. Wilson that Mr. Wilson needed to wipe down his table every time he got up from lunch.[129]  Neither he nor Mr. Walker ever heard Mr. Green saying something like that to other employees.[130]

Mr. Wilson testified that, after his workplace injury made it difficult for him to walk,  Mr. Green would not give Mr. Wilson rides from the parking lot in his golf cart—even though Mr. Wilson saw Mr. Green pick up other employees.[131]  In fact, Mr. Wilson testified that Mr. Green made Mr. Wilson walk "a football field and a half" to get paperwork the first day he came back

---

[125] Dep. of Derrick Wilson (Doc. 34) at 213:17–216:1.

[126] *Id.*

[127] *Id.* at 81:15–17.

[128] *Id.* at 82:3–16.

[129] *Id.* at 216:2–217:6.

[130] *Id.*; Dep. of Eric Walker (Doc. 35) at 59:23–24.

[131] Dep. of Derrick Wilson (Doc. 34) at 224:10–225:4.

from his workplace injury.[132]   When Mr. Walker offered to get the paperwork instead of Mr.

Wilson, Mr. Green insisted that Mr. Wilson get it himself.[133]   Then, for the rest of Mr. Wilson's

tenure, Mr. Green placed him at a desk "with nothing to do" and "[n]o heater" and told him he had

"better not leave the chair" except to "go to the restroom . . . ."[134]   When Mr. Wilson took a little

bit longer in the restroom, Mr. Green would "come and look in the stall and see what [Mr. Wilson

was] doing."[135]   Finally, at one point, Mr. Mangum and Mr. Green took Mr. Wilson's chair away

from him and gave it to Steve Kline, telling Mr. Wilson that Mr. Kline was "a working man . . .

."[136]

## DISCUSSION

Summary judgment is appropriate when "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."[137]   Conversely, if the nonmoving party

can present specific facts "showing the existence of a genuine issue for trial," then summary

judgment is not appropriate.[138]   The moving party has the burden of showing that (1) there is an

absence of a genuine dispute of material fact on at least one essential element of the nonmoving

party's case and (2) the absence means that a rational juror could not possibly find for the

nonmoving party on that essential element of the nonmoving party's case.[139]   If the moving party

meets that burden, the burden then shifts to the nonmoving party to show that there is a genuine

---

[132] *Id.* at 141:3–8, 221:7–24; Dep. of Eric Walker (Doc. 35) at 79:2–9.

[133] Dep. of Derrick Wilson (Doc. 34) at 141:6–8.

[134] *Id.* at 75:16–21, 223:1–9.

[135] *Id.* at 75:20–21.

[136] *Id.* at 147:2–148:10.

[137] Fed. R. Civ. P. 56(a).

[138] *Grey v. City of Oak Grove*, 396 F.3d 1031, 1034 (8th Cir. 2005).

[139] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

dispute of material fact.[140]  The nonmoving party meets this burden by designating specific facts in affidavits, depositions, answers to interrogatories, admissions, or other record evidence that shows "there is a genuine issue for trial."[141]  The Court must view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences.[142]

As explained at the outset of this Order, the only claims remaining for serious consideration are (1) the § 1981 inferior-equipment disparate treatment claim, (2) the Title VII and § 1981 inferior-compensation disparate treatment claims, and (3) the § 1981 hostile work environment claim.  And as explained below, summary judgment is appropriate on all claims except the § 1981 hostile work environment claim.  Because the standards under Title VII and § 1981 are essentially identical for each type of claim, the Court groups them by topic rather than statute.

## I.    Disparate Treatment Claims

Because Mr. Wilson brought no direct evidence of discrimination, all of his disparate treatment claims must proceed under the *McDonnell Douglas* framework.[143]  Mr. Wilson concedes that this is the right way to analyze his disparate treatment claims.[144]  Under *McDonnell Douglas*, Mr. Wilson bears the initial "burden to establish a prima facie case of discrimination."[145]  To make out a prima facie case, Mr. Wilson must show that "(1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated

---

[140] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

[141] *Celotex Corp.*, 477 U.S. at 322–24 (citation omitted).

[142] *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015).

[143] *See, e.g.*, *Jones v. City of St. Louis*, 825 F.3d 476, 480 (8th Cir. 2016) (applying the burden-shifting framework of *McDonnell Douglas* because plaintiff presented no direct evidence of discrimination).

[144] Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 27) at 20–22.

[145] *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 873 (8th Cir. 2010).

employees outside the protected class were treated differently).”[146]  Correspondingly, to survive summary judgment, Mr. Wilson must provide evidence from which a rational juror could conclude he established a prima facie case.

"A prima facie case creates a rebuttable presumption of discrimination."[147]  If Mr. Wilson makes out a prima facie case, the “burden then shifts to [Grove] to provide a legitimate, nondiscriminatory reason for its decision.”[148]  If Grove does so, "‘the presumption raised by the prima facie case is rebutted’ and ‘drops from the case.’"[149]  Mr. Wilson then has "‘the full and fair opportunity to demonstrate,’ through presentation of his own case and through cross-examination of [Grove’s] witnesses, ‘that the proffered reason was not the true reason for the employment decision,’ and that race was.”[150]  Correspondingly, to survive summary judgment, Mr. Wilson must provide evidence from which a rational juror could conclude that race was the true reason for the employment decision at issue.

With this test in mind, we can now turn to the two types of disparate treatment claims involved in this case.

### A.      Disparate Treatment Based on Inferior Equipment

Mr. Wilson satisfies the first and second elements of his prima facie case for his inferior-equipment disparate treatment claim under § 1981.  No one disputes that Mr. Wilson is Black or that (at the time period in issue) Mr. Wilson was meeting Grove’s legitimate business expectations. Mr. Wilson’s prima facie case runs into trouble, however, on the third element.  That element

---

[146] *Id.* at 874.

[147] *Id.* at 873.

[148] *Id.*

[149] *St. Mary’s Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal citations omitted) (quoting *Tex. Dep’t of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 & n.10 (1981)).

[150] *Id.* at 507–08 (internal citations omitted) (quoting *Burdine*, 450 U.S. at 256).

requires Mr. Wilson to show that he suffered an adverse employment action.  "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage.  Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, but minor changes that merely inconvenience an employee or alter an employee's work responsibilities do not."[151]

The use of a Tyvek hood instead of a PAPR does not rise to the level of an adverse action. While Mr. Green testified that PAPRs "might" make it easier for painters to maneuver, not being supplied with the most efficient equipment is not a material employment disadvantage.[152]  Any productivity deficits that may have been caused by the Tyvek hood were an inconvenience at most. The closest Mr. Wilson comes to suggesting that the Tyvek hood caused him a material employment disadvantage is with his and Mr. Walker's testimony that the Tyvek hood caused them some health problems.  But this testimony is rank speculation, completely unsubstantiated by any competent evidence, witness, or expert.

Neither Mr. Wilson nor Mr. Walker are experts on the safety of painting masks.  And there is no other record evidence suggesting that Tyvek hoods are unsafe to use or are appreciably less safe to use than PAPRs are.  There is no suggestion that supplying a painter with a Tyvek hood is an OSHA violation or a violation of any other federal or state law.  On the contrary, what we do know from the record definitively supports the idea that Tyvek Hoods are a safe alternative to PAPRs.  Mr. Green, the Plant Production Manager of the Bauxite facility, testified that PAPRs and

---

[151] *Spears v. Mo. Dep't of Corr. & Hum. Res.*, 210 F.3d 850, 853 (8th Cir. 2000) (citations omitted).

[152] *Enowmbitang v. Seagate Tech., Inc.*, 148 F.3d 970, 973 (8th Cir. 1998) ("[W]hether [an employer] wishes to give its [employees] specific pieces of equipment is a business decision that is not susceptible to judicial oversight."); *Jacob-Mua v. Veneman*, 289 F.3d 517, 522 (8th Cir. 2002) (stating that being "given inferior equipment by . . . supervisors" does not "rise to the level of an adverse employment action").

Tyvek hoods are equally safe.  Unlike Mr. Wilson and Mr. Walker, Mr. Green's responsibilities include safety equipment decisions.[153]  Moreover, and perhaps most importantly, all 54 painters at Grove's Pennsylvania facility use the Tyvek hood instead of the PAPR.

In short, because there is no evidence that suggests being given a Tyvek hood instead of a PAPR constitutes an adverse action, Mr. Wilson's disparate treatment claim based on inadequate equipment fails at the third step of his prima facie case.[154]

### B.    Disparate Treatment Based on Inferior Compensation

Mr. Wilson satisfies the first, second, and third elements of his prima facie case for his inferior-compensation disparate treatment claims under Title VII and § 1981.  As noted above, no one disputes that Mr. Wilson is Black or that (at the time period in issue) Mr. Wilson was meeting Grove's legitimate business expectations.  Further, Grove does not resist the notion that receiving inferior compensation is an adverse action.

The problem for Mr. Wilson's claims is the fourth element of his prima facie case.  That element requires Mr. Wilson to show an inference of discrimination.  In the context of an inferior-compensation disparate treatment claim, the way to satisfy this requirement is to produce evidence that could lead a rational juror to conclude that similarly situated employees outside the protected class were treated differently.[155]  To put it differently, "[i]n order to establish a *prima facie* case of

---

[153] *See* Ex. 2 (Decl. of Paul Green) to Defs.' Mot. for Summ. J. (Doc. 20-2) ¶¶ 7, 16.

[154] The lack of an adverse action is not the only issue plaguing Mr. Wilson's inferior-equipment disparate treatment claim.  The white painters Mr. Wilson says received PAPRs were not similarly situated to Mr. Wilson.  That is because Mr. Green ordered their masks at a time when the supply chain was not disrupted by Covid.  Mr. Walker's mask was ordered before the disruption, and Mr. Wyatt's and Mr. Shannon's masks were ordered after the disruption.  While it is true that Mr. Green did not even attempt to order Mr. Wilson a PAPR until Mr. Wilson had been at the company for several months, Mr. Walker testified that it was several months before Mr. Walker received his mask as well.  Ultimately, the lack of similarly situated comparators due to the Covid supply-chain delays fatally undermines any inference of discrimination.  It also strongly suggests that Grove has a legitimate and non-discriminatory business reason for not providing Mr. Wilson with a PAPR.

[155] *Carter v. Pulaski Cnty. Special Sch. Dist.*, 956 F.3d 1055, 1058 (8th Cir. 2020).

salary discrimination under Title VII" at the summary-judgment stage, Mr. Wilson must produce evidence that could lead a rational juror to conclude that Grove "paid different wages to employees of different races for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."[156] Mr. Wilson hasn't done that.

Mr. Wilson says he was hired at a lower starting wage than the wage at which similarly situated white painters were hired. But there is no evidence of that. The two comparators Mr. Wilson points to are Mr. Dick and Mr. Wyatt. Mr. Dick started out (as a full-time employee) at $18.00 per hour in early 2020.[157] Mr. Wilson started out at the same wage in the same basic time period, even though he was only hired on a temporary basis through a staffing agency at that point. In fact, Mr. Wilson's starting wage as a full-time employee ($18.09) was $0.09 higher than Mr. Dick's starting wage ($18.00) as a full-time employee.[158] And although Mr. Wyatt's full-time starting wage ($18.50) was $0.41 higher than Mr. Wilson's full-time starting wage, that was because Mr. Wyatt was hired nearly 11 months later and after Grove had updated its pay structure.[159] Mr. Wyatt and Mr. Wilson each started out (when hired full-time) at the exact same grade and step. When Mr. Wilson was hired full-time in July of 2020, that grade and step was paid $18.09. By the time Mr. Wyatt was hired full-time in June of 2021, that grade and step paid $18.50. Long story short, in the Court's view, the length of time and change in pay structure between their respective hiring dates means that Mr. Wyatt and Mr. Wilson were not similarly situated painters for purposes of comparing their full-time starting salaries.

---

[156] *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 989 (8th Cir. 2003) (citations and quotations omitted).

[157] Ex. A (Defs.' Suppl. Discovery Resps.) to Ex. 2 (Decl. of Katelynn Williams) to Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30-2) ¶ 7.

[158] *Id.* ¶¶ 7, 8.

[159] *Id.* ¶¶ 8, 10.

Mr. Wilson next says that Mr. Green failed to get Mr. Wilson the same raises that Mr. Green got Mr. Dick and Mr. Wyatt.  But, for purposes of comparing raises, neither Mr. Dick nor Mr. Wyatt was similarly situated to Mr. Wilson.  Let's begin with Mr. Dick.  Mr. Dick's first pay increase occurred when Grove updated its pay structure in May of 2020.  Mr. Dick's pay went to $18.66.[160]  Mr. Wilson didn't get this adjustment.  But the reason for this is undisputed.  It's because in May of 2020 Mr. Dick had been a full-time Grove employee for several months while Mr. Wilson was still only in a temporary role through a staffing agency.  This difference matters.  It means that Mr. Dick was not similarly situated to Mr. Wilson.  It is true that, a few months later, in July of 2020, Mr. Wilson was hired full-time.  It is also true that his starting full-time wage ($18.09) was $0.57 (and one step) lower than the wage that Mr. Dick had been bumped to in May of 2020.[161]  But comparing the wage (and step) bumps between (1) a temporary employee who gets hired as a full-time employee and (2) an employee who has already been working in a full-time role for several months is an apples-to-oranges comparison.  Put another way, Mr. Dick was not similarly situated to Mr. Wilson with respect to this pay differential.

As Mr. Wilson notes, Mr. Dick got another raise (and advanced a step) in October of 2020 to $19.23.[162]  This was a performance-based advancement, regularly given at this time.  Mr. Wilson did not get this fall performance-based advancement.  But the reason he didn't get it is undisputed.  A company policy required that a worker be employed in a full-time role before April of a given year in order to receive that year's fall performance-based raise.  Mr. Wilson was not in a full-time role until July, while Mr. Dick had been in a full-time role since February. Again, those two employees were therefore not similarly situated.

---

[160] *Id.* ¶ 7.

[161] *Id.* ¶¶ 7–8.

[162] *Id.* ¶ 7.

The next two pay increases Mr. Dick received were increases that Mr. Wilson also received.  It is undisputed that these increases resulted from the May 2021 corporate-wide adjustment to the pay structure and the August 2021 modification for all production workers.  In May of 2021, Mr. Wilson got a $0.41 bump because the corporate pay structure changed such that Grade 313, Step 2 would be paid $18.50 instead of $18.09.[163]  At the same time, Mr. Dick got a $0.43 bump because the corporate pay structure changed such that Grade 313, Step 4 would be paid $19.66 instead of $19.23.[164]  As a general matter, the two were not treated differently and so this does not raise an inference of discrimination.  To the extent Mr. Wilson is trying to home in on the $0.02 raise differential or the difference in the absolute amount that each person was paid after the restructuring, the two painters were not similarly situated because of the pre-existing difference in steps that has already been discussed above.

In August of 2021, all production employees were given a progression increase, meaning they were all advanced one step on the pay scale.  Mr. Wilson was advanced from Grade 313, Step 2 to Grade 313, Step 3, with a resulting pay increase of $0.58 to $19.08.[165]  Mr. Dick was advanced from Grade 313, Step 4 to Grade 313, Step 5, with a resulting pay increase of $0.58 to $20.24.[166]  Again, as a general matter, the two were not treated differently and so this does not raise an inference of discrimination.  To the extent Mr. Wilson is trying to home in on the difference in the absolute amount that each person was paid after the step advancement, the two painters were not similarly situated because of the pre-existing difference in steps that has already been discussed above.

---

[163] *Id.* ¶ 8.

[164] *Id.* ¶ 7.

[165] *Id.* ¶ 8.

[166] *Id.* ¶ 7.

It is true that later in August of 2021, Mr. Dick received a promotion to Painter II, which came along with a significant grade increase and (correspondingly) a $2.09 raise to $22.33.[167]  Mr. Wilson never received a promotion.  But undisputed record evidence makes clear the two employees were not similarly situated at the time of the promotion.  Mr. Wilson had not performed any painting work for 9 months—since his November 2020 workplace injury.  On the other hand, Mr. Dick had been painting or "blasting" for his entire tenure and was still going strong.[168]

Now we turn to Mr. Wyatt.  Mr. Wyatt's first raise was in August of 2021 as a result of the modification for all production workers.[169]  There's no reason to spend much time on this raise, as it was exactly the same raise that Mr. Wilson received at that time.  Both went from Grade 313, Step 2 to Grade 313, Step 3 (and from $18.50 to $19.08) as a result of corporate's decision to give a progression advancement to all production workers.[170]  There was no different treatment to raise an inference of discrimination.

Later in August, however, on the same day as Mr. Dick, Mr. Wyatt was promoted to Painter II at $22.33 per hour.[171]  As discussed above, Mr. Wilson never received a promotion to Painter II.  But, as was true with Mr. Dick, Mr. Wilson and Mr. Wyatt were not similarly situated at the time of the promotion—because Mr. Wilson had been unable to paint for many months.

---

[167] *Id.*

[168] *See Faulkner v. Douglas Cnty.*, 906 F.3d 728 (8th Cir. 2018) (plaintiff with medical restrictions was not similarly situated to employees who did not have medical restrictions). Mr. Wilson points out that Mr. Dick was promoted despite being in a "blasting" role, which, according to Mr. Wilson, requires less skill than painting. Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 27) at 25.  But Mr. Wilson's subjective evaluation of the skill required for a particular aspect of a job is irrelevant.

[169] Ex. A (Defs.' Suppl. Discovery Resps.) to Ex. 2 (Decl. of Katelynn Williams) to Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30-2) ¶ 10.

[170] *Id.* ¶¶ 8, 10.

[171] *Id.* ¶¶ 7, 10.

To be comprehensive, it is worth directly addressing a more sophisticated and nuanced iteration of the disparate treatment argument that Mr. Wilson could be making.  Mr. Wilson notes that Mr. Wyatt was promoted to Painter II within two-and-a-half months of starting full-time at Grove.[172]  Mr. Wilson also notes that this resulted in Mr. Wyatt's pay going from $18.50 to $22.33 over those same two and a half months.  The implication seems to be that this is a big difference from how Mr. Wilson was treated—his pay barely increased from March of 2020 to May of 2021 and ultimately only went up to $19.08 over the course of his nearly two-year tenure.  Of course, Mr. Wilson was a temporary employee between March of 2020 and July of 2020.  And, after November of 2020, Mr. Wilson could not perform his painting duties.  But that still leaves four months—July of 2020 to November of 2020—in which Mr. Wilson's wage was stagnant at $18.09.  Why didn't Mr. Wilson advance (in step, grade, or pay) in these four months while Mr. Wyatt advanced so quickly after coming to the company in June of 2021?

Mr. Wilson's argument ultimately resolves to interrogating why he was not promoted to Painter II between July of 2020 (when he was hired full-time) and November of 2020 (when he was injured and stopped painting).  But there is no evidence any painter received such a promotion in or around this time frame.  Like Mr. Wilson, Mr. Dick was theoretically eligible for a promotion between July and November of 2020.  Yet Mr. Dick was not promoted during this time period either.  Mr. Dick is a far better comparator than Mr. Wyatt with respect to a possible promotion to Painter II in the summer and fall of 2020—because Mr. Dick was working at the facility at that time and Mr. Wyatt was not.  Mr. Dick was not promoted to Painter II until he had put in nearly 18 months of full-time work.  And Mr. Dick's promotion came at the same time as Mr. Wyatt's promotion.  The fact that these promotions came at the same time suggests that (1) Grove was not

---

[172] Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 27) at 25.

promoting any painters in the summer and fall of 2020, and (2) Grove was promoting its painters in August of 2021, a time when Mr. Wilson was not painting and had not been for a while.

Having shown no inference of discrimination, Mr. Wilson's prima facie case fails. However, even if Mr. Wilson had established an inference of discrimination, Grove provided legitimate business reasons for the differences in compensation between Mr. Wilson and other painters. And, based on this record, no rational juror could conclude that those legitimate business reasons were pretext for racial discrimination. The record definitively shows that Grove followed its step-rate pay structure very closely. The record also definitively shows that Mr. Wilson's starting wage as a temporary worker and his starting wage as a full-time worker were commensurate with the starting wages paid to other painters. So there's no evidence to suggest Grove low-balled him at the start. As to the fall 2020 performance-based raises, there is no record evidence disputing the existence of the company policy that rendered Mr. Wilson ineligible for that raise. As to subsequent potential performance-based raises or the August 2021 promotions, there is no record evidence disputing the point that these events occurred well after Mr. Wilson stopped being able to fulfill the painter role.

In all events, summary judgment for Grove is appropriate.

## II. Hostile Work Environment

Section 1981 hostile work environment claims are analyzed under the same framework as Title VII hostile work environment claims.[173] A prima facie case for a hostile work environment claim requires a plaintiff to establish that: "(1) [he] is a member of a protected group; (2) unwelcome harassment occurred; (3) a causal nexus existed between the harassment and [his]

---

[173] *Eliserio v. United Steelworkers of Am. Loc. 310*, 398 F.3d 1071, 1076 (8th Cir. 2005).

protected group status; and (4) the harassment affected a term, condition, or privilege of employment."[174]

The fourth element—whether the harassment affected a term, condition, or privilege of employment—has both objective and subjective components.[175] The court must determine whether the alleged harassment is "'severe or pervasive enough to create an objectively hostile or abusive work environment' and the victim must subjectively believe [his] working conditions have been altered."[176] "[A] work environment is objectively offensive [if it is] one which a reasonable person would find hostile or abusive . . . ."[177] To determine whether a work environment is objectively hostile, courts "examine all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance."[178]

The Eighth Circuit has cautioned that "[t]he standards for a hostile environment are demanding, and conduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment."[179] To state a hostile work environment claim, a plaintiff must allege "more than a few isolated incidents."[180] Instead, "[t]he alleged harassment must be so

---

[174] *Hairston v. Wormuth*, 6 F.4th 834, 841 (8th Cir. 2021) (citations omitted). "When a plaintiff's claim is based on harassment by a non-supervisory employee, [he] also must show that h[is] employer knew or should have known of the harassment and failed to take proper action." *Id.* at 841 n.2 (citations and quotations omitted). Neither party argues that this standard applies here. In any event, the Court need not reach this issue to resolve Mr. Wilson's claim.

[175] *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 801 (8th Cir. 2009).

[176] *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)).

[177] *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759 (8th Cir. 2004).

[178] *Id.*

[179] *Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 799 (8th Cir. 2021) (citation omitted).

[180] *Id.* (citations and quotations omitted).

intimidating, offensive, or hostile that it poisoned the work environment."[181]   It is probably a serious understatement to say that this is a "steep mountain for plaintiffs" to summit.[182]

Grove pushes hard against the third and fourth elements here.  It argues that most of the instances of harassment Mr. Wilson provides in support of his hostile work environment claim are not race-based.[183]  And the two instances that Grove acknowledges are race-based—that Mr. Green stated that he would have plowed over Black Lives Matter protesters, and that Mr. Green told Mr. Wilson that Mr. Green did not believe in mixed relationships—cannot recast all of the other incidents as race-based.[184]  In support of this proposition, Grove cites *Singletary v. Missouri Department of Corrections*.[185]  In that case, a Black employee had information that some co-workers used racial epithets on some occasions during his tenure at the Department of Corrections.  He also found his car vandalized in the parking lot.  The Eighth Circuit concluded that the usage of racial epithets was not proof that the vandalism of the plaintiff's car was race-based.[186]

*Singletary* is different from the instant case.  In *Singletary*, there was nothing connecting the persons making the racial comments to the vandalism.  The racial comments were made by a few different officers, and it was never determined who vandalized the car.[187]  So the jump that

---

[181] *Id.* (citations and quotations omitted).

[182] *Cf. Watson v. Century Mgmt., LLC*, No. 3:18-cv-00141-LPR, 2020 WL 5751566, at *4 (E.D. Ark. Sept. 25, 2020), *aff'd*, 851 F. App'x 657 (8th Cir. 2021); *see also Blomker v. Jewell*, 831 F.3d 1051, 1058–59 (8th Cir. 2016) (citing cases); *McMiller v. Metro*, 738 F.3d 185, 188–89 (8th Cir. 2013) (holding that a male supervisor's inappropriate behavior toward a female employee was not sufficiently severe or pervasive to establish harassment where the supervisor "kissed [the employee's] face on two occasions, placed his arms around her or attempted to do so three times, and requested that she remove an ingrown hair from an area near his chin"); *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 650–53, 653 n.4 (8th Cir. 2003) (holding that supervisor referring to plaintiff as "black boy" and "boy" on several occasions, describing "Africans as having big penises," and saying that plaintiff was homosexual because he was a Muslim did not rise to the level of a hostile work environment).

[183] Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30) at 9–12.

[184] *Id.*

[185] 423 F.3d 886 (8th Cir. 2005).

[186] *Id.* at 892–94.

[187] *Id.*

the vandalism was connected to the racist remarks was more speculation than reasonable inference. In our case, however, on the most pro-plaintiff read of the record rationally possible, Mr. Green is both the person who made the racially charged remarks and the person who harassed Mr. Wilson. A rational juror could conclude that Mr. Green's racially charged remarks suggest that his other acts of harassment, even if not explicitly racial in nature, were motivated by racial animus.

Recall that Mr. Green made multiple racially charged comments.  He stated to Mr. Wilson that he did not believe in mixed relationships; he facetiously asked a new hire if the new hire could tell Mr. Wilson apart from Mr. Walker; he stated that he would have plowed over Black Lives Matter protesters; he called truckers "Black MFer's"; and he casually used the N-word in conversations with Mr. Walker.  All this left Mr. Walker with the impression that Mr. Green was a racist.  A rational juror could easily draw the conclusion that Mr. Green harbored some form of racial animus towards Mr. Wilson—who was at times the only Black employee at the facility and at times one of two or three Black employees at the facility.

From there, a rational juror could reasonably infer that Mr. Green's racial animus is why Mr. Green subjected Mr. Wilson to workplace restrictions that did not apply to other employees. For example, Mr. Green's racial animus could explain why Mr. Green made Mr. Wilson walk through a different door than other employees, why Mr. Green would not give Mr. Wilson rides in his golf cart after Mr. Wilson injured his leg despite giving other employees rides, why Mr. Green subjected Mr. Wilson to stricter rules surrounding meals and bathroom breaks, and why Mr. Green told Mr. Wilson that Mr. Wilson couldn't leave his chair except to go to the bathroom.  While these rules are not overtly racial, given Mr. Green's racially charged comments, and given the testimony that Mr. Green subjected only Mr. Wilson to these rules, a rational juror could find that these rules were given to Mr. Wilson because of his race.

Racial animus could also explain Mr. Green's verbal and physical aggression toward Mr. Wilson.  While it is true that other white employees were also subjected to similar conduct, a rational juror could find that Mr. Wilson was subjected to this treatment on a more regular basis and to a more serious degree than other employees.  For example, Mr. Wilson was yelled at on a near-daily basis while Mr. Walker was yelled at one or two times per month.  Mr. Green "slapped" Mr. Wilson with his umbrella but only "tapped" Mr. Walker.  And while Mr. Green dragged Mr. Walker across the room by his arm, which Mr. Walker characterized as "horseplay," Mr. Green twisted Mr. Wilson's arm with such force and in such a manner that it got cut on a door.  And he did this out of anger.  Finally, while Mr. Walker testified to witnessing Mr. Green in a choking match with another white employee, the testimony is that both were equally engaged in the physical interaction.  This is distinct from the physical interactions Mr. Green had with Mr. Wilson in which Mr. Wilson was always a passive victim—like the shadow-boxing incident where Mr. Green punched Mr. Wilson (multiple times) hard enough to cause pain.  In sum, a rational juror could infer that Mr. Green subjected Mr. Wilson to heightened verbal and physical aggression because of Mr. Wilson's race.

Grove next argues that, even assuming all of Mr. Green's conduct was causally related to his racial animus, the incidents for which Mr. Wilson provides any proof do not meet the high bar necessary to be objectively offensive.[188]  Grove is certainly correct that this bar is very high.  The purely verbal conduct—Mr. Green yelling at Mr. Wilson daily and Mr. Green making racially charged comments to Mr. Wilson or around Mr. Wilson—is insufficient on its own to meet this high bar.  But the facts of this case (under Mr. Wilson's version of events, which is the version the

---

[188] Defs.' Reply Br. in Supp. of Mot. for Summ. J. (Doc. 30) at 13.

Court must assume at this stage of the litigation[189]) go beyond verbal harassment.  Mr. Green—who, to remind everyone, was Mr. Wilson's ultimate boss—laid hands on Mr. Wilson more than once.  He caused Mr. Wilson pain with punches.  He caused Mr. Wilson's arm to bleed, twisting it in such a way that it got cut by a door.  He hit Mr. Wilson with an umbrella.  He shoved Mr. Wilson.  And these were all on different occasions.  And as discussed above, a rational juror could find that no other employee (meaning no white employee) was subjected to physical aggression to the same frequency or degree as Mr. Wilson was.

Given the incredibly high standard necessary for objective offensiveness, even the addition of the instances of physical aggression doesn't clearly suffice.  If the above was the sum total of the harassment, the summary-judgment question would be exceedingly close.  But we cannot forget the other indignities visited upon Mr. Wilson (again, assuming the truth of Mr. Wilson's version of events[190]).  One in particular.  Recall that Mr. Wilson was not allowed to walk through a door that was a shortcut through the main office.  Recall that this was a door that all other employees (again, meaning the white employees) were allowed to use.  Grove has provided no justification for this indignity.  A rational juror could conclude that this rule was given to Mr. Wilson for nefarious, race-based reasons—to pester Mr. Wilson, to make his daily work experience harder, to prevent him from being seen walking through the main office, to remind him of his place, or to keep him separate.  Whatever the particular iteration of awful reason, this type of daily indignity harkens back to segregationist policies that no person should be expected to tolerate at the workplace.  What if Grove actually had a "White Entrance" and a "Black Entrance," with the respective signs placed above the doors?  Wouldn't that type of humiliation of Black

---

[189] *See infra* note 191.

[190] *Id.*

employees on its own be offensive enough to have "affected a term, condition, or privilege of employment"?  Yes, yes, it would.  Just like having separate water fountains or separate bathrooms.

Assuming Mr. Wilson's version of events is accurate, which must be assumed at this stage of the litigation, a rational juror could find that the door restriction to which Mr. Wilson alone was subjected was intended to mark Mr. Wilson—at the time the only Black employee—with a badge of inferiority; that is such a morally repugnant restriction to labor under that it meets the Eighth Circuit's high bar for being objectively offensive.  Ultimately, combining restrictions like this one with the daily yelling, the repeated instances of physical aggression, and the multiple racially charged comments, a rational juror could find that the workplace was "poisoned" with "pervasive" harassment well beyond "a few isolated incidents."[191]

## CONCLUSION

For the reasons discussed above, Grove's Motion for Summary Judgment is GRANTED in part and DENIED in part.  Mr. Wilson's § 1981 hostile work environment claim proceeds to trial.  Summary judgment is granted in favor of Grove on all other claims.

IT IS SO ORDERED this 13th day of June 2023.


_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[191] *Warmington*, 998 F.3d at 799.  Of course, it is incredibly important to remember that we are only at the summary-judgment stage—a stage at which the Court must resolve all genuine disputes of material fact in favor of Mr. Wilson.  The version of events as told by Mr. Wilson and his allies may differ considerably from the version of events that a jury ultimately concludes occurred.  All this is to say that no one should, at this point, ascribe any nefarious conduct to Grove, Mr. Green, or any other actor in this story.  The true facts are yet to be conclusively established.